**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**


DAVID RAVE,

        Plaintiff,

HA

v.                                         No. CIV 17-0636 RB/LF

BOARD OF COMMISSIONERS FOR THE
COUNTY OF BERNALILLO, CORRECT
CARE SOLUTIONS, LLC., TIMOTHY
MCMURRAY, MD, AND JOHN DOES 1–10,

        Defendants.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the County Defendant's Motion to Dismiss Plaintiff's Amended "Complaint for Civil Rights Violations" and Memorandum in Support Thereof, filed on June 27, 2017. (Doc. 11.) Jurisdiction arises under 28 U.S.C. § 1331. Having considered the submissions of counsel and relevant law, the Court will grant in part Defendant's Motion as outlined below.

This lawsuit arises out of Defendants' alleged failure to provide Plaintiff with necessary, emergent medical care while he was incarcerated at the Bernalillo County Metropolitan Detention Center (MDC). Plaintiff brought a seven-count Complaint in the Second Judicial District Court, County of Bernalillo, State of New Mexico, on June 9, 2017. (*See* Doc. 1-A (Compl.).) Defendant Board of Commissioners for the County of Bernalillo (the County) removed the Complaint to this Court on June 12, 2017. (Doc. 1.)

# I.    Statement of Facts

The following facts are as alleged in Plaintiff's Complaint. Mr. David Rave (Plaintiff) suffers from end stage renal failure. (Compl. ¶ 11.) On Saturday, March 12, 2016,[1] Plaintiff was arrested and booked into the MDC. (*Id.* ¶ 9.) Plaintiff told the booking officer that he had chronic kidney disease and received dialysis three times a week on Tuesday, Thursday, and Saturday. (*Id.* ¶ 10.) He also told the booking officer that his last session was on Thursday, March 10, 2016. (*Id.*) Plaintiff was due for another treatment the day he was arrested.

Plaintiff told the first corrections officer (CO) who put him in an open pod that he needed dialysis. (*Id.* ¶ 12.) Plaintiff told "medical" that he needed dialysis, but "nothing happened." (*Id.*) Plaintiff also told a second CO, this CO said he had informed medical of Plaintiff's need. (*Id.* ¶ 13.) Plaintiff spoke to a Sergeant; the Sergeant advised Plaintiff to "tell the CO because it was not his job." (*Id.*) Plaintiff began to suffer physical consequences: "[h]e couldn't sleep in spite of being tired, his body ached, and he [had] a hard time breathing." (*Id.* ¶ 14.)

Four days later, on March 16, 2013, Plaintiff told a CO to "please help me—I need medical." (*Id.* ¶ 15.) Someone took Plaintiff to the medical unit with shortness of breath and chest pain; Plaintiff could not urinate and was swollen with fluid (approximately 50 pounds over his normal weight of 130). (*Id.*) Plaintiff had not had dialysis for six days. (*Id.* ¶ 16.)

Plaintiff was transported to the University of New Mexico Hospital (UNMH) Emergency Room, where he was assessed with "shortness of breath, chest pain, high potassium (hyperkalemia) with EKG changes." (*Id.* ¶ 17.) Plaintiff told UNMH staff that he was limiting his fluid intake, because he did not know when he would receive necessary dialysis, and he was unable to urinate. (*Id.* ¶ 18.) Plaintiff's potassium level was "critical at 8.2." (*Id.* ¶ 19.) Plaintiff

---

[1] Plaintiff asserts in his Complaint that he was arrested on March 12, 2013, yet every other date is listed as 2016. (Compl. ¶ 9.) The Court presumes that Plaintiff was arrested in 2016, and "2013" was a clerical error.

received hemodialysis twice that day, which is "hard on his body." (*Id.*) Hospital staff noted that Plaintiff "needs HD [hemodialysis] support but he is not getting HD at the Jail so will continue HD while being admitted and ask social worker to be involved." (*Id.*) In Plaintiff's March 19, 2016 Transfer Orders and Discharge Instructions, hospital staff noted, "Please make sure patient doesn't miss his HD sessions." (*Id.* ¶ 21 (emphasis omitted).)

Upon his return to the MDC, Plaintiff "was housed in SHU[2] pending clearance by the doctor." (*Id.* ¶ 22.) Plaintiff told the COs that he needed to get dialysis and asked them to either speak to medical staff or have medical staff come to him. (*Id.* ¶ 23.) One CO told Plaintiff that he could not help and advised him to "file a grievance on the Kiosk . . . ." (*Id.* ¶ 24.) When Plaintiff went to the Kiosk, he found a sign that read "grievances could not be done at that time." (*Id.*)

At 11:15 p.m. the same evening, Plaintiff went to the MDC medical unit for complaints of chest pain and explained his medical needs and issues to the staff there. (*Id.* ¶ 25.) An ECG taken at the medical unit "showed inferior ST elevation[,]" and Plaintiff was transported to the Emergency Room, where he was admitted on March 20, 2016, with acute pulmonary edema. (*Id.* ¶ 26.) Plaintiff received dialysis "several more times at the hospital . . . ." (*Id.* ¶ 27.) Plaintiff's March 23, 2016 Discharge Summary stated: "PLEASE BRING PATIENT BACK TO UNMH ON TUES, THU and SAT for Hemodialysis." (*Id.* ¶ 28 (emphasis omitted).) The Discharge Summary also noted that the MDC did not have a dialysis center yet, so Plaintiff would need to come back to UNMH for dialysis. (*Id.*)

Plaintiff was referred to Gibson Dialysis on March 23, 2016, with additional services approved for March 31, April 2, and April 5, 2016. (*Id.* ¶ 29.) Medical notes from this period reflect that Plaintiff had high blood pressure, which started to come down with dialysis. (*Id.* ¶

---

[2] Plaintiff does not define what SHU stands for, but the Court presumes it is some type of segregated housing unit.

30.) Staff at Gibson Dialysis advised Plaintiff to limit his fluid intake to one liter per day and to eat a renal (low sodium) diet. (*Id.*) Plaintiff asserts that MDC never gave him the required diet during his time there. (*Id.* ¶ 31.)

Plaintiff presented to the MDC medical unit on March 24, 2016, reporting shortness of breath and a heavy chest. (*Id.* ¶ 32.) Plaintiff stated that he needed Dialysis treatment, and medical unit staff sent Plaintiff to the UNMH Emergency Room. (*Id.*) Plaintiff "was admitted to UNMH on March 24, 2016, presenting with dyspnea and hypoxia." (*Id.* ¶ 34.) Due to his breathing, Plaintiff was intubated and admitted to the MICU. (*Id.*) Hospital notes from March 26, 2016, reflect that Plaintiff received dialysis daily. (*Id.*) A hospital physician told Plaintiff "that had he not been brought in, he may have had a heart attack and died." (*Id.*) The March 29, 2016 discharge documents show that Plaintiff had dialysis that day and was in good condition, he should have a renal diet, fluids restricted to two liters per day, and he "needed Chem10 prior to dialysis." (*Id.* ¶ 35, 37.) The Discharge Summary directed MDC staff to bring Plaintiff back to UNMH for hemodialysis on Tuesdays, Thursdays, and Saturdays. (*Id.* ¶ 35)

Plaintiff "was housed in SHU until he was cleared to population on March 30, 2016." (*Id.* ¶ 39.) Plaintiff received dialysis on March 31, April 2, 5, 7, 9, 12, and 15, 2016. (*Id.* ¶ 40.) Plaintiff was released from the MDC to Pre-Trial Services on April 13, 2016. (*Id.* ¶ 41.) Plaintiff continued to receive dialysis as scheduled, including on Tuesday, July 5, 2016, the day he was arrested on a probation violation. (*Id.* ¶ 42.)

Plaintiff was transported from the MDC to Lovelace Hospital for dialysis on July 7, 2016. (*Id.* ¶ 43.) He was scheduled to receive dialysis on Saturday, July 9, but MDC did not take him due to "staffing issues." (*Id.* ¶ 44.) MDC staff notes incorrectly stated that Plaintiff "was dialyzed at UNMH yesterday [July 8], so may be able to wait until next appt. on Tuesday." (*Id.*)

Plaintiff went to the Gibson Dialysis Clinic for dialysis on July 12, 2016. (*Id.* ¶ 45.) After his treatment, his blood pressure was high, he complained of a headache, and he was vomiting. (*Id.*) Clinic staff released Plaintiff to be evaluated by an MDC physician. (*Id.*) Plaintiff received dialysis treatments on July 14 and 16, and was scheduled for treatment on Tuesday, July 19, 2016. (*Id.* ¶ 46.) MDC's pharmacy tech noted that Plaintiff's dialysis was scheduled for 6:00 a.m., but he had court at 8:30 a.m. (*Id.*) The pharmacy tech wrote, "Spoke with provider Dr. McMurray; okay for patient to go to court. [Plaintiff] is scheduled to go to dialysis on Thursday at 0600." (*Id.*)

The next day, Plaintiff was transported to the UNMH Emergency Room with shortness of breath and respiratory failure. (*Id.* ¶ 48.) Plaintiff was intubated and transferred to the "MICU for respiratory arrest secondary to volume overload." (*Id.*) Plaintiff's condition improved after hemodialysis, and he was later discharged back to MDC. (*Id.*) Plaintiff received regular dialysis for the remainder of July until his release from the MDC on July 28, 2016. (*Id.* ¶ 49.)

Plaintiff was arrested for another probation violation on November 7, 2016, and was booked into the MDC. (*Id.* ¶ 50.) Plaintiff received some dialysis treatments while at the MDC, but he was admitted to UNMH again on November 13, 2016, "for 'acute hypoxic respiratory failure likely secondary to fluid overload from non-compliance with hemodialysis as an outpatient' requiring intubation and urgent hemodialysis." (*Id.* ¶ 51.) Plaintiff was discharged to the MDC on November 16, 2016. (*Id.*) He was readmitted to UNMH for "'urgent' dialysis due to hyperkalemia/elevated potassium" on November 26, 2016. (*Id.* ¶ 52.) Plaintiff reported that the MDC had forgotten to take him to dialysis the day before. (*Id.*) Plaintiff's Complaint is silent on the date he was released from the MDC after his most recent probation violation.

Plaintiff filed suit in state court against three named Defendants (the County, Correctional Healthcare Companies, Inc. (CHC), and Timothy McMurray, MD), and John Does 1–10 alleging: (1) negligence against Dr. McMurray; (2) violations of the Fourteenth and Eighth Amendments against all Defendants; (3) violations of the Americans with Disabilities Act (ADA) and section 504 of the Rehabilitation Act against the County and CHC; (4) negligent hiring, training, supervision, and retention against the County and CHC; (5) negligent medical care and treatment against all Defendants; (6) negligent operation of motor vehicles against the County; and (7) negligent operation of a building against the County. (*See id.* ¶¶ 55–124) The County now moves to dismiss Counts Two through Seven of Plaintiff's Complaint for failure to state a claim.[3] (*See* Doc. 11.)

## II.     Motion to Dismiss Standards

In reviewing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1108 (10th Cir. 2015) (citations omitted). To survive a motion to dismiss, the complaint does not need to contain "detailed factual allegations," but it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)).

---

[3] The County actually stated it moves to dismiss under "Rule 12(b)(1) and (6) because the Plaintiff's Complaint fails to state a claim on the merits . . . ." (Doc. 11, at 2.) It appears that the County's citation of Rule 12(b)(1) was inadvertent, as that section provides that a party may move to dismiss for lack of subject matter jurisdiction, and the County does not make any arguments relevant to subject matter jurisdiction in either its Motion or its Reply. (*See* Docs. 11; 22.) Rule 12(b)(6) is the appropriate section to move to dismiss for failure to state a claim. Fed. R. Civ. P. 12(b)(6). Because the Court finds it has subject matter jurisdiction over Plaintiff's Complaint based on 28 U.S.C. § 1331, it will analyze the Motion to Dismiss only under Rule 12(b)(6).

### III. Discussion

#### A. Count Two—Cruel and Unusual Punishment in Violation of the Fourteenth and Eighth Amendments

Plaintiff brings a claim for cruel and unusual punishment against all Defendants in Count Two. (Compl. at ¶¶ 62–75.) Before the Court examines the merits of Plaintiff's claim, there are several preliminary issues to consider.

##### 1. Preliminary Issues

First, the County asserts that because Plaintiff failed to state in his Complaint that he had been released from the MDC at the time he filed his Complaint, his claim should be dismissed for failure to exhaust his administrative remedies pursuant to the Prison Litigation Reform Act (PLRA). (Doc. 11, at 7–8.) It is true that if Plaintiff was incarcerated at the time he filed his Complaint, he would be subject to the exhaustion requirements of the PLRA. *See Norton v. City of Marietta, Okla.*, 432 F.3d 1145, 1149–50 (10th Cir. 2005). If he had been released at the time he filed his Complaint, he would *not* have to satisfy the exhaustion requirement. *See id.* at 1150. Plaintiff asserts in his responsive brief that he was not incarcerated at the time of filing. (Doc. 18, at 2.) The Court will analyze the County's Motion to Dismiss under the assumption that Plaintiff had been released at the time he filed his Complaint. The Court will, however, direct Plaintiff to file an amended complaint that includes the fact of his release date. Plaintiff's failure to file an amended complaint without including the release date will result in the dismissal with prejudice of his federal claim.

Second, with respect to Count Two, Plaintiff asserts that he had the same rights as either a pretrial detainee (under the Fourteenth Amendment) or a convicted inmate (under the Eighth Amendment). (*See* Compl. at 10, n.1.) The County disputes "that Plaintiff was a 'pretrial

detainee' – given that he was repeatedly being arrested for probation violations, having already been adjudicated guilty . . . ." (Doc. 11, at 6 n.5.) It appears to the Court that Plaintiff was a pretrial detainee from the time of his initial arrest on March 12, 2016, through April 13, 2016, when he was released from the MDC to Pretrial Services. (Compl. ¶¶ 9–41.) The County's argument that Plaintiff's status was closer to that of a convicted inmate is more persuasive during Plaintiff's later two periods of incarceration after he had violated the terms of his probation. *See Kellum v. Bernalillo Cty.*, No. CIV 14-00163 RB/CG, -- F. Supp. 3d --, 2017 WL 3278948, at *3–6 (D.N.M. Jan. 27, 2017) (discussing the difference between a pretrial detainee and an incarcerated person). Plaintiff's status is largely irrelevant for the analysis of his federal claim, because the standard for a denial of medical care is the same for both pretrial detainees and incarcerated persons. *But cf.*, *Chavez v. Bd. of Cty. Comm'rs of Sierra Cty.*, 899 F. Supp. 2d 1163, 1185 (D.N.M. 2012) (noting that "a plaintiff must plead the correct constitutional provision underlying the § 1983 claim to state a valid claim") (citations omitted).

Third, the County argues Plaintiff has failed to make allegations specific enough to state a claim against any of the individual "John Doe" Defendants. (*See* Docs. 11, at 6–7; 22, at 3–4 ("there simply cannot be a placeholder without a specific designation of which John Doe allegedly engaged in specific conduct that is allegedly actionable").) Plaintiff argues in his response that the John Doe Defendants "can be held liable pursuant to 42 U.S.C. § 1983 for violations of Plaintiff's rights as '[a]ny official who "causes" a citizen to be deprived of her constitutional rights can also be held liable.'" (Doc. 18, at 5 (quoting *Buck v. City of Albuquerque*, 549 F.3d 1269, 1279 (10th Cir. 2008) (emphasis omitted)).) Plaintiff also cites to authority relevant to the liability of supervisors under section1983. (*Id.* at 5–7.)

While the Court will not take up the matter of the John Doe Defendants for purposes of the County's Motion, the Court notes that Plaintiff must make more specific allegations in his amended complaint. *See Roper v. Grayson*, 81 F.3d 124, 126 (10th Cir. 1996) (gathering cases re: ability of a plaintiff to use unnamed defendants); *see also Rall v. Hobbs Mun. Sch. Dist.*, 15cv0518, Mem. Op. & Order, Doc. 44, at 7–9 (D.N.M. Mar. 16, 2016) (discussing individual versus official capacity suits, and personal versus supervisory liability claims).

The Court turns now to Plaintiff's municipal liability claim against the County.

### 2. Plaintiff has alleged facts sufficient to state a claim for cruel and unusual punishment against the County.

The County will not "be held liable under § 1983 solely because its officers inflicted injury." *Griego v. City of Albuquerque*, 100 F. Supp. 3d 1192, 1212 (citing *Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006) (citing *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 694 (1978))). "Rather, to establish municipal liability under § 1983, a plaintiff must demonstrate: (i) that an officer committed an underlying constitutional violation; (ii) that a municipal policy or custom exists; and (iii) that there is a direct causal link between the policy or custom, and the injury alleged." *Id.* (citing *Graves*, 450 F.3d at 1218 (internal citation omitted)). The County assumes for purposes of its Motion that Plaintiff can establish a constitutional violation. It argues instead that the allegations fail to establish that such a violation was the result of any County policy. (Doc. 11, at 7.)

Plaintiff alleges in his Complaint that "Defendants had a custom, policy, or practice of acting knowingly and with deliberate indifference in denying obviously necessary medications, medical services, and hospitalizations to inmates at MDC, including Plaintiff." (Compl. ¶ 65.) Plaintiff further alleges that "Defendants, both on their own and through their physicians, nurses,

other health center staff, and administrators, had an official policy, custom, or practice that was deliberately indifferent to Plaintiff's Eighth Amendment rights. . . . Defendants' unconstitutional policies, customs or practices were the legal and proximate cause of Plaintiff's damages." (*Id.* ¶¶ 72–73.)

"Pleading a municipal policy, custom, or practice is like pleading the breach element of negligence—which is also ultimately a question of fact for the jury." *Griego*, 100 F. Supp. 3d at 1213. "The plaintiff cannot simply allege that there is a policy in place, but, rather, must plead facts that, if true, would give rise to a plausible inference that such a policy exists." *Id.* "With formal or written policies, satisfying this pleading standard is easy; the plaintiff can simply allege what the policy is and where it is codified." Plaintiff does not cite a written policy in his Complaint.

> To make allegations sufficient to show an informal policy, custom, or practice,
>
> the plaintiff can plead either a pattern of multiple similar instances of misconduct—no set number is required, and the more unique the misconduct is, and the more similar the incidents are to one another, the smaller the required number will be to render the alleged policy plausible—or use other evidence, such as a police officers' statements attesting to the policy's existence.

*Id.* Here, Plaintiff lays out a series of allegedly unconstitutional actions from COs who, according to the Complaint, knew of his disability and acted deliberately and indifferently in failing to obtain medical help for Plaintiff. (*See* Compl. ¶¶ 9–53.) One allegation of failure to obtain medical treatment would likely be insufficient to show an informal policy, custom, or practice, but the Court finds several such instances over three separate periods of incarceration is sufficient to show a pattern of misconduct. *See Griego*, 100 F. Supp. 3d at 1212 ("Establishing an informal policy or custom requires the plaintiff to show that the misconduct was

'widespread'—*i.e.*, that it involved a 'series of decisions.'") (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 130 (1988)).

The County argues that Plaintiff has failed to allege facts to show that the officers' actions "represent[] the execution of an official policy rather than gross deviations from such policy." (Doc. 11, at 7 (quoting *Lujan ex rel. Lujan v. Cty. of Bernalillo*, 354 F. App'x 322, 326 (10th Cir. 2009).) In *Lujan*, the plaintiff argued that officers violated her Fourth Amendment rights during an allegedly improper search of her home. *Lujan*, 354 F. App'x at 324. The court found the plaintiff failed to provide evidence that either "link[ed] the individual defendants to the challenged conduct" or to show that the challenged conduct represented an improper policy. *Id.* at 326. Here, Plaintiff has pleaded facts sufficient to show that the County has an informal policy, custom, or practice of not requiring COs to obtain medical help for inmates. Therefore, *Lujan* is inapposite. The Court will deny the County's Motion to Dismiss on this issue.

In his Response brief, Plaintiff further argues that municipal liability also lies in the County's "failure to adopt or implement a policy or training to prevent violations of [his] rights." (Doc. 18, at 6 (emphasis and citations omitted).) There is, however, only one allegation in Plaintiff's Complaint under Count Two related to training: "Plaintiff . . . was denied the benefits of . . . staff/employees properly trained to deal with citizens with serious life threatening and life altering medical conditions . . . ." (Compl. ¶ 67.) While the Court understands that the allegation of a failure to train is likely related to the allegations of an unwritten policy, custom, or practice, Plaintiff's single allegation regarding training is conclusory and insufficient to properly state a claim for municipal liability due to a lack of training. *See Griego*, 100 F. Supp. 3d at 1227–28. Plaintiff must make more specific factual allegations in his amended complaint to show that the

County's "failure to train reflect[ed] a 'deliberate' or 'conscious' choice" in order to state a claim that is plausible on its face. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989).

**B.    Count Three—Violations of the Americans with Disabilities Act and section 504 of the Rehabilitation Act**

Count Three of Plaintiff's Complaint is not a model of clarity, but from a reading of the Complaint and Plaintiff's Response, it appears Plaintiff is making claims under Titles II and III of the ADA, as well as section 504 of the Rehabilitation Act.

**1.    Plaintiff fails to state a claim under Title II or section 504.**

To state a claim under either Title II of the ADA or section 504 of the Rehabilitation Act, Plaintiff "must allege that (1) he is a qualified individual with a disability, (2) who was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, and (3) such exclusion, denial of benefits, or discrimination was by reason of a disability." *Robertson v. Las Animas Cty. Sheriff's Dep't*, 500 F.3d 1185, 1193 (10th Cir. 2007) (citing 42 U.S.C. § 12132; subsequent citation omitted); *see also Swenson v. Lincoln Cty. Sch. Dist. No. 2*, 260 F. Supp. 2d 1136, 1145 (D. Wyo. 2003) (noting that "[t]he elements of a cause of action under Title II of the ADA and section 504 of the Rehabilitation Act are the same because Congress has directed courts to construe the ADA as giving at least the same amount of protection as the Rehabilitation Act") (citing 42 U.S.C. § 12201(a); *DeBord v. Bd. of Educ. of Ferguson-Florissant Sch. Dist.*, 126 F.3d 1102, 1104–05 (8th Cir. 1997) (internal citations omitted); *Baird v. Rose*, 192 F.3d 462, 468 (4th Cir. 1999)). The County argues that the conduct Plaintiff complains of—the denial of necessary medical care—is not "discrimination" that violates Title II or section 504. (Doc. 11, at 8–9 (citations omitted).) The Court agrees and finds

Plaintiff's claims under Title II of the ADA and section 504 of the Rehabilitation Act fail for at least three reasons.

First, Plaintiff fails to show that the County discriminated against him *solely* because of his disability. In *Johnson by Johnson v. Thompson*, 971 F.2d 1487, 1492 (10th Cir. 1992), *cert. denied*, 507 U.S. 910 (1993), the court analyzed a claim under section 504 of the Rehabilitation Act and held that "to state a claim under section 504," the plaintiff must prove in part that "he was discriminated against solely by reason of his handicap . . . ." 971 F.2d at 1492 (citations and brackets omitted). The court noted that "[t]he word *solely* provides the key: the discrimination must result from the handicap and from the handicap alone." *Id.* at 1493.

Plaintiff does not allege that the discrimination resulted from his disability; rather, he alleges that the County denied him medical care for multiple reasons: (1) because a CO said "it was not his job" (Compl. ¶13); (2) a CO said "that he couldn't help"; (*id.* ¶ 24); (3) a staff person noted that Plaintiff "was dialyzed at UNMH yesterday [July 8], so may be able to wait until next appt. on Tuesday" (*id.* ¶ 44); (4) because he had court (*id.* ¶ 46), and (5) "because of staffing issues" (*see* Doc. 18, at 14). Plaintiff makes no allegations in his Complaint or Response that the County ever denied him medical care *solely because of* his disability. In *Johnson*, the court noted that the disabled persons were denied medical care both because of their disability and also because of their socioeconomic status. *Johnson*, 971 F.2d at 1493. Consequently, the court found that the disabled persons failed to state a claim for discrimination under section 504. *Id.* Likewise, because Plaintiff argues that the discrimination here was due to a variety of additional reasons, he fails to state a claim under Title II of the ADA and section 504 of the Rehabilitation Act.

Second, and on a similar note, Plaintiff fails to show that he is "*otherwise qualified*" under the ADA or Rehabilitation Act. The Tenth Circuit has noted that "the term *otherwise qualified* cannot ordinarily be applied 'in the comparatively fluid context of medical treatment decisions without distorting its plain meaning.'" *Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1144 (10th Cir. 2005) (citing *Johnson*, 971 F.2d at 1494). In *Fitzgerald*, the Tenth Circuit noted that where a prisoner alleged that a doctor violated Title II of the ADA by denying surgery for a broken hip, the prisoner could not show he was "otherwise qualified." 403 F.3d at 1144. "Fitzgerald would not have been 'otherwise qualified' for such treatment in the absence of his alleged disability—his alleged disability in this case was the reason why Fitzgerald was seeking medical treatment." *Id.* The same holds true for Plaintiff: his disability was the reason he was seeking medical treatment, so he would not have been otherwise qualified for treatment or transport. His claims under Title II and section 504, therefore, fail.

Third, the County argues that Plaintiff's allegations do not rise to the level of an ADA violation (Doc. 11, at 9 (citations omitted).) The ADA, asserts the County, "does not provide a remedy for medical negligence or a means to challenge 'purely medical decisions' regarding the propriety of a course of treatment." (*Id.* (quoting *Brown v. Idaho Dep't of Corr.*, No. 13-cv-01342-REB-KMT, 2014 WL 4695958, at *9 (D. Colo. Sept. 19, 2014) (quoting *Nasious v. Colo.*, 495 F. App'x 899, 902 (10th Cir. 2012) (internal and subsequent citations omitted))).) The Court agrees.

The Tenth Circuit has explained that "the failure to provide medical treatment to a disabled prisoner, while perhaps raising Eighth Amendment concerns in certain circumstances, does not constitute an ADA violation." *Rashad v. Doughty*, 4 F. App'x 558, 560 (10th Cir. 2001) (citing *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) ("concluding that the ADA 'would

not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners' and that the statute 'does not create a remedy for medical malpractice'"); *McNally v. Prison Health Servs.*, 46 F. Supp. 2d 49, 58 (D. Me. 1999) ("distinguishing between 'claims that the medical treatment received for a disability was inadequate from claims that a prisoner has been denied access to services or programs because he is disabled,' and concluding that only the latter class of claims states an ADA violation")). "In contrast, the allegation that a disabled prisoner has been denied services that have been provided to other prisoners may state an ADA claim." *Id.* (citing *McNally*, 46 F. Supp. 2d at 58 ("concluding that an HIV patient's claim of discriminatory denial of prescription services provided to general prison population would state an ADA claim")).

In *Rashad*, the plaintiff (a prisoner) "allege[d] inadequate treatment of his post-traumatic stress disorder but [did] not allege that the defendant corrections officials discriminated against him on the basis of that disorder." *Id.* Similarly, Plaintiff does not claim that he was denied services that were provided to other prisoners. The County's denial of dialysis or a special diet, like the defendants' denial of treatment for post-traumatic stress disorder in *Rashad* or surgery in *Fitzgerald*, is a decision that relates to "the propriety of a course of treatment" and is not cognizable under Title II of the ADA.

Plaintiff believes his claim is viable pursuant to the decision in *Tivis v. Dowis*, No. 11-cv-02050-PAB-KMT, 2014 WL 7437661 (D. Colo. Dec. 29, 2014). (Doc. 18, at 15.) Plaintiff misunderstands *Tivis*. In *Tivis*, the plaintiff "allege[d] that decisions made by a non-medical professional prevented him from accessing prescription pain medication *available to other inmates*." *Tivis*, 2014 WL 7437661, at *9. Plaintiff's Complaint is devoid of any such

allegations. Ultimately, Plaintiff fails to state a claim under Title II of the ADA or section 504 of the Rehabilitation Act, and the Court will grant the County's motion with respect to these claims.

### 2. Plaintiff's claim under Title III is moot.

Plaintiff alleges that the County and CHC "refused to provide the necessary level of accommodation for Plaintiff's medical condition and needs resulting in physical injuries to Plaintiff." (Compl. ¶ 92.) It appears that Plaintiff is attempting to state a claim under Title III of the ADA.[4] "While Title III of the ADA prohibits discrimination against persons with disabilities in places of public accommodation, 42 U.S.C. § 12182(a), a Title III plaintiff's sole remedy is injunctive relief, *Chambers v. Melmed*, 141 F. App'x 718, 720 (10th Cir. 2005) (citing 42 U.S.C. § 12188(a))." *Handy v. Meyer*, No. 11-cv-00644-WYD-KMT, 2011 WL 7478990, at *9 (D. Colo. Dec. 30, 2011) (citing *Lewis v. Burger King*, 361 F. App'x 937 n. 1 (10th Cir. 2010) (internal citation omitted)). "When a party seeks only equitable relief, . . . past exposure to alleged illegal conduct does not establish a present live controversy if unaccompanied by any continuing present effects." *Id.* (quoting *McClendon v. City of Albuquerque*, 100 F.3d 863, 867 (10th Cir. 1996) (internal citation omitted)).

Plaintiff asserts in his response that he is no longer an inmate at the MDC. (Doc. 18, at 2.) "Because Plaintiff may only seek equitable injunctive relief under Title III, the fact that he is no longer at [the MDC] renders his Title III claim moot." *See Handy*, 2011 WL 7478990, at *9 (citing *Green v. Branson*, 108 F.3d 1296, 1300 (10th Cir. 1997) ("prisoner's transfer mooted his claim for declaratory and injunctive relief as a judgment in the prisoner's favor 'would amount to

---

[4] To state a claim for failure to accommodate under Title III, Plaintiff must show "(1) that he is disabled within the meaning of the ADA, (2) that the defendant is a private entity that owns, leases, or operates a place of public accommodation, and (3) that the defendant failed to make reasonable modifications that would accommodate the plaintiff's disability, without fundamentally altering the nature of the public accommodation." *Phillips v. Tiona*, No. 10-cv-00334-PAB-KMT, 2011 WL 2198532, at *6 (D. Colo. Mar. 11, 2011) (citing *Doe v. Okla. City Univ.*, 406 F. App'x 248, 250–51 (10th Cir. 2010) (internal citation omitted)).

nothing more than a declaration that he was wronged, and would have no effect on the defendants' behavior towards him'") (internal citations omitted)). The Court will grant the County's motion with respect to Count Three.

### C.       Counts Four through Seven—State Tort Claims Pursuant to the NMTCA

Plaintiff purports to bring a variety of state tort claims for negligence pursuant to the New Mexico Tort Claims Act (NMTCA). The NMTCA "shields 'governmental entities and public employees from tort liability unless immunity is specifically waived by' the" NMTCA. *Trujillo v. Salazar*, No. CIV-04-0689 JB/WDS, 2006 WL 1228827, at *5 (D.N.M. Mar. 1, 2006) (quoting *Archibeque v. Moya*, 866 P.2d 344, 346 (N.M. 1993) (internal citations omitted)). "A plaintiff may not sue a governmental entity of New Mexico or its employees or agents unless the plaintiff's cause of action fits within one of the exceptions listed in the NMTCA." *Hunt v. Cent. Consol. Sch. Dist.*, 951 F. Supp. 2d 1136, 1193 (D.N.M. 2013) (citing *Begay v. New Mexico*, 723 P.2d 252, 256 (N.M. Ct. App. 1985) ("Consent to be sued may not be implied, but must come within one of the exceptions to immunity under the Tort Claims Act.") (internal citation omitted), *rev'd on other grounds by Smialek v. Begay*, 721 P.2d 1306 (N.M. 1986)).

### 1.       Count Four—Plaintiff states a claim for negligent hiring, training, supervision, and retention.

Plaintiff asserts a claim against the County and CHC for negligent hiring, training, supervision, and retention in Count Four. Specifically, he alleges that the County's negligence included (1) inadequate mental health screening of the John Doe Defendants "who failed to render aid to Plaintiff and interfered with" Plaintiff's treatment; (2) "[i]nadequate 'fit for duty' evaluations" of the John Doe Defendants "as perspective [sic] employees and failure to perform adequate employee performance evaluations"; (3) "[i]nadequate management, training, and

enforcement of policies regarding inmate transfers and transport, guarding inmates who are hospital patients, and responding to inmates with medical issues . . . ." (Compl. ¶ 99.)

He does not cite the specific section of the NMTCA that waives the County's immunity for negligence in Count Four (*see* Compl. ¶¶ 96–102), but he clarifies in his Response that he brings the claim under section 41-4-6, which waives immunity "for damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment or furnishings." N.M. Stat. Ann. § 41-4-6(A). (*See also* Doc. 18, at 20 (quotation omitted).) The County argues Count Four should be dismissed because Plaintiff "does not explain in what way the County was negligent in hiring or training[,]" and because the NMTCA "does not specify a tort waiver for negligent supervision." (Doc. 11, at 10 (quoting *Lessen v. City of Albuquerque*, 187 P.3d 179, 184 (N.M. Ct. App. 2008) (internal citations omitted)).)

"The Supreme Court of New Mexico has explained that 'the liability envisioned by [§ 41-4-6] is not limited to claims caused by injuries occurring on or off certain "premises," as the words "machinery" and "equipment" reveal.'" *Hunt*, 951 F. Supp. 2d at 1240 (quoting *Cobos v. Doña Ana Cty. Hous. Auth.*, 970 P.2d 1143, 1146 (N.M. 1998) (internal citations omitted)). Rather, section "41-4-6 'contemplates waiver of immunity where due to the alleged negligence of public employees an injury arises from an unsafe, dangerous, or defective condition on property owned and operated by the government.'" *Id.* (quoting *Bober v. N.M. State Fair*, 808 P.2d 614, 623 (N.M. 1991) (internal citation omitted) (alteration in original)). For example, the Supreme Court of New Mexico allowed a claim under section 41-4-6 when "a young girl nearly drowned at a public swimming pool . . . when an inadequate number of capable lifeguards were

on duty." *Upton v. Clovis Mun. Sch. Dist.*, 141 P.3d 1259, 1262 (N.M. 2006) (citing *Leithead v. City of Santa Fe*, 940 P.2d 459, 463 (N.M. Ct. App. 1997)). The court "held that negligent implementation of safety protocols created a dangerous condition arising from 'operation' of the facility within the meaning of Section 41-4-6." *Id.* (citing *Leithead*, 940 P.2d at 463).

"For the waiver to apply, the negligent operation or maintenance must create a dangerous condition that threatens the general public or a class of building users, and must not just be a claim of negligent supervision . . . ." *Hunt*, 951 F. Supp. 2d at 1194 (citation omitted). The County argues that Plaintiff's allegations amount to a "singular discrete administrative decision[] affecting only a single person—himself." (Doc. 22, at 8.) The Court disagrees. Plaintiff's allegations relate to "a class of building users"—incarcerated inmates with medical issues. "The waiver applies to more than the operation or maintenance of the physical aspects of the building, and includes safety policies necessary to protect the people who use the building." *Upton*, 141 P.3d at 1261 (citing *Castillo v. Santa Fe Cty.*, 755 P.2d 48, 50–51 (N.M. 1988) ("stating the county's failure to respond to a pack of dogs roaming a public housing facility created a dangerous condition to residents and their invitees, and fell under the waiver"); *Leithead*, 940 P.2d 459 ("indicating failure by a public swimming pool to provide an adequate number of capable lifeguards created a dangerous condition arising out of the operation of the pool")). Plaintiff's allegations, which span three separate instances of incarceration, relate to such policies that are necessary to protect ill inmates.

The Court finds the New Mexico Supreme Court's decision in *Upton v. Clovis Municipal School District*, 141 P.3d 1259 (N.M. 2006), instructive. There, the court "held that a school district's 'failure to follow safety policies in place for all at-risk students appears to fall comfortably within the Section 41-4-6 waiver for "operation or maintenance" of a public

building.'" *Hunt*, 951 F. Supp. 3d at 1194 (quoting *Upton*, 141 P.3d at 1262). In *Upton*, a student "collapsed and died from an asthma attack after a substitute physical education teacher required her to continue exercising" despite the fact that her parents had given the school written and verbal notice about the student's condition. *Id.* (citing *Upton*, 141 P.3d at 1260). The court noted that "[i]f the only alleged misconduct . . . had been the substitute P.E. teacher failing to watch her while she participated in physical exercise, the Upton[s'] claim . . . would be" one for negligent supervision and, therefore, inadequate to trigger liability under section 41-4-6. *Id.* (quoting *Upton*, 141 P.3d at 1264). "It found, however, that the school's conduct went beyond negligent supervision, because: (i) the school ignored information that the plaintiffs provided them; (ii) the school failed to warn the substitute teacher about the student's condition; and (iii) the school failed to follow through with the proper emergency procedures." *Id.* (citing *Upton*, 141 P.3d at 1264). "These actions and omissions combined to create the dangerous conditions, placing [the student] in a far worse position than reasonable and expected risks of [school] life." *Id.* (quoting *Upton*, 141 P.3d at 1264). Here, Plaintiff alleges that the County's employees ignored information he gave them about his medical condition, failed to staff the facility or manage or train its employees to render aid to inmates with medical conditions, and failed to follow through with and/or enforce its policies related to inmates with medical issues. *See Upton*, 141 P.3d at 1264. The allegations go beyond accusations that the County failed to supervise one inmate. The Court finds that the facts as alleged are in line with the cases holding that municipalities can be liable under section 41-4-6 for creating dangerous conditions at facilities, and are sufficient to withstand the County's Motion to Dismiss.

## 2. Count Five—Negligent Medical Care and Treatment

Plaintiff asserts a claim for negligent medical care and treatment against the County and other Defendants in Count Five. (Compl. ¶¶ 103–10.) Again, Plaintiff fails to cite a specific section of the NMTCA, but it appears he brings this claim pursuant to section 41-4-9, which waives immunity for "damages . . . caused by the negligence of public employees while acting within the scope of their duties in the operation of any hospital, infirmary, mental institution, clinic, dispensary, medical care home or like facilities." N.M. Stat. Ann. § 41-4-9.

Plaintiff's claim against the County fails, however, because "liability against a jail cannot be based on § 41-4-9 when the jail has contracted with a private entity to provide medical services." *Salazar v. San Juan Cty. Det. Ctr.*, No. CIV 14-0417 JB/LF, 2016 WL 335447, at *49 (D.N.M. Jan. 15, 2016) (citing *Lessen*, 187 P.3d at 185). While the County owes a duty to "provide appropriate medical care to persons they incarcerate[,]" this obligation does not "equate[] with [a] waiver of immunity for negligent operation of an infirmary under" section 41-4-9. *Lessen*, 187 P.3d at 185 (citations omitted). Instead, the *Lessen* court noted, a prisoner "might be entitled to recover under the waiver of immunity provided in Section 41-4-12." *Id.*

Plaintiff alleges in his Complaint that CHC contracts with the County "to provide healthcare to inmates . . . ." (Compl. ¶ 5.) Consequently, he cannot bring a claim against the County under section 41-4-9. The County's Motion is granted as to Count Five.

## 3. Count Six—Negligent Operation of Motor Vehicles

In Count Six, Plaintiff asserts a claim for negligent operation of motor vehicles pursuant to section 41-4-5 against the County only. (*Id.* ¶¶ 111–18.) Section 41-4-5 waives immunity "for damages . . . caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any motor vehicle, aircraft or watercraft." N.M. Stat.

Ann. § 41-4-5. Specifically, Plaintiff alleges that the County's failure to transport Plaintiff to the facility to receive dialysis due to understaffing caused Plaintiff to suffer damages. (Compl. ¶¶ 113–16.) This claim fails as a matter of law. A failure to transport using a motor vehicle is not equivalent to the "operation or maintenance of [a] motor vehicle" as contemplated by the statute. *See, e.g.*, *Lessen*, 187 P.3d at 182 (finding that where there is no evidence a driver was in a motor vehicle, the driver could not "be said to be 'operating' the vehicle" to fall within the meaning of section 41-4-5). The County's Motion is granted as to Count Six.

### 4.    Count Seven—Negligent Operation of Building

Plaintiff asserts a claim against the County only in Count Seven for negligent operation of a building under section 41-4-6. (Compl. ¶¶ 119–24.) This claim appears to be duplicative of that in Count Four.

### 5.    Plaintiff fails to state a claim under section 41-4-12.

Plaintiff generally cites section 41-4-12 in both his Complaint (Compl. ¶ 3) and his Response (Doc. 18, at 19), but does not specifically cite this section in Counts Four through Seven.

Section 41-4-12 waives immunity "for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties." N.M. Stat. Ann. § 41-4-12. Plaintiff does not make any allegations related to one of the enumerated torts in section 41-4-12. Presumably, Plaintiff would contend that his injuries resulted from the deprivation of his rights under the Eighth and Fourteenth Amendments

as alleged in Count Two. Plaintiff's claims under Counts Four through Seven, however, sound in negligence. Negligence is insufficient to establish a violation under either the Eighth or Fourteenth Amendments. *See*, *e.g.*, *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199 n.5 (1989) (noting that "[t]o make out an Eighth Amendment claim based on the failure to provide adequate medical care, a prisoner must show that the state defendants exhibited 'deliberate indifference' to his 'serious' medical needs; the mere negligent or inadvertent failure to provide adequate care is not enough") (quoting *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976))). Consequently, Plaintiff fails to state a claim under section 41-4-12 and the Court grants the County's Motion on this issue.

> **6.  Plaintiff may not recover fees and costs under 42 U.S.C. § 1988 for his state tort law claims.**

Plaintiff includes a request for attorneys' fees and expenses under 42 U.S.C. § 1988 in three of his four state tort law claims. (*See* Compl. ¶¶ 102, 118, 124.) Section 1988 does not provide for fees or costs for state tort law claims. *See* 42 U.S.C. § 1988(b). The County's Motion will be granted with respect to this issue. (Doc. 11, at 9 n.7.)

## IV.  Conclusion

The County's Motion is granted in part and denied in part as follows:

Count Two: Plaintiff has pleaded facts sufficient to show that the County has an informal policy, custom, or practice of not requiring COs to obtain medical help for inmates. The Court will deny the County's Motion to Dismiss on this issue. Plaintiff has not alleged facts sufficient to state a municipal liability claim based on the County's failure to adopt or implement a policy or training to prevent violations of inmates' rights. The Court grants the County's Motion with respect to any federal constitutional claim for municipal liability based on a failure to train.

<u>Count Three</u>: Plaintiff fails to state a claim under Title II of the ADA or section 504 of the Rehabilitation Act, and the Court grants the County's Motion on these issues. Because Plaintiff is no longer an inmate at the MDC, his claim under Title III of the ADA is denied as moot.

<u>Count Four</u>: To the extent Plaintiff asserts a claim for negligent hiring, training, supervision, and retention under section 41-4-6, his allegations are sufficient and the Court denies the County's Motion on this issue.

<u>Count Five</u>: Plaintiff's claim against the County under section 41-4-9 fails, and the Court grants the County's Motion on this issue.

<u>Count Six</u>: Plaintiff's claim against the County under section 41-4-5 fails, and the Court grants the County's Motion on this issue.

<u>Count Seven</u>: Plaintiff's claim in Count Seven appears to be duplicative of his claim in Count Four and should be consolidated in his amended complaint.

<u>Claims under section 41-4-12</u>: Plaintiff fails to state a claim under section 41-4-12 against the County, and the Court grants the County's Motion on this issue.

<u>Request for attorneys' fees and expenses under 42 U.S.C. § 1988</u>: The Court grants the County's Motion with respect to any request for fees or expenses under section 1988 for Plaintiff's state tort law claims.

The Court dismisses the claims above without prejudice, and Plaintiff shall file an amended complaint in accordance with the Court's August 16, 2017 Scheduling Order. (Doc. 28.)

**THEREFORE,**

**IT IS ORDERED** that the County's Motion to Dismiss Plaintiff's Amended "Complaint for Civil Rights Violations" and Memorandum in Support Thereof (Doc. 11) is **GRANTED IN PART** as outlined herein.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**